**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM F. BYRNE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE CLEVELAND CLINIC, et al.** | : | |
| **Defendants.** | : | **NO. 09-889** |

**MEMORANDUM**

GENE E.K. PRATTER, J.                                                     February 5, 2010

Pro se plaintiff William F. Byrne brings claims under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), a federal statute, as well as a claim for breach of implied contract under Pennsylvania law. Defendants The Cleveland Clinic and Chester County Hospital move to dismiss the case pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and also because they argue Mr. Byrne did not file his complaint within the applicable statutes of limitations. For the reasons that follow, the Court will grant the motions to dismiss to the extent that Mr. Byrne brings a stabilization claim under EMTALA. The Court will also dismiss Mr. Byrne's state law breach of implied contract claim.[1] The Court will deny the motions to dismiss as to Mr. Byrne's EMTALA screening claim.

I.       FACTUAL AND PROCEDURAL HISTORY

         A.       Procedural History

          Mr. Byrne initially filed a Complaint on March 12, 2009. By way of Order on the same date, this Court granted Mr. Byrne's IFP Application but dismissed his Complaint because the

---

[1] Defendants did not expressly move to dismiss Mr. Byrne's breach of *implied* contract claim, limiting their arguments to Mr. Byrne's purported claim for breach of *express* contract. Nevertheless, the Court is obliged to evaluate the governing law as, when, and if the Court finds it - even without the assistance of the parties. As explained below, the allegations of the Amended Complaint make clear that Mr. Byrne cannot proceed with an implied contract claim.

Court lacked jurisdiction over the subject matter of the Complaint, as then presented. [2]

Several weeks later, Mr. Byrne filed an Amended Complaint, invoking federal jurisdiction pursuant to EMTALA. As a result, the Court ordered the Clerk to reopen Mr. Byrne's case and issue summons so that service of the Amended Complaint could be made by the United States Marshals Service.

The Cleveland Clinic and Chester County Hospital have filed motions to dismiss the Amended Complaint. These motions raise a variety of arguments, all discussed below. Mr. Byrne opposes the motions and has endeavored to marshal appropriate caselaw to support his position. The Court recognizes the challenges presented to a pro se litigant in such circumstances, and acknowledges that Mr. Byrne has presented a respectful effort to "tell his story" by emphasizing the facts as he recounts them and trying to assemble various cases that appear to him to be germane to the issues.[3] Notwithstanding his efforts, the Court cannot disregard the impact of persuasive case law that fundamentally denies him the opportunity to pursue many of the issues of which he complains.

---

[2] Mr. Byrne filed an Application to Proceed without Prepayment of Fees and Affidavit ("IFP Application"), on which there is a handwritten date of "2/14/09." According to the Court's civil docket, the IFP Application was filed with the Clerk of Court on February 27, 2009, and was entered on the docket on March 4, 2009. As discussed below, the handwritten date may have significance to the viability of Mr. Byrne's claims.

On March 12, Mr. Byrne's IFP Application was granted, and his initial Complaint was filed on the docket. In this Complaint, Mr. Byrne brought claims for "breach of implied contract" and medical malpractice, and purported to assert jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441. In dismissing the Complaint, Court concluded that, on the face of the initial pleading, there was no diversity between the parties, and that the federal statutes invoked by Mr. Byrne did not confer subject matter jurisdiction upon the Court.

[3] Since the time Mr. Byrne's Amended Complaint was filed, the Court has also granted Chester County Hospital's motion for a protective order, denied Chester County Hospital's motion to strike Mr. Byrne's "Further Reply Response," and denied Mr. Byrne's motion for discovery.

B.     Allegations of the Amended Complaint

The format and structure of Mr. Byrne's Amended Complaint are integral to Defendants' arguments regarding the identity and construction of his claims. Accordingly, in spite of the risk of redundancy, Mr. Byrne's allegations are described below in the order in which they appear (and in some cases, reappear) in pleadings in this case.[4]

In the "Introduction" to his Amended Complaint, Mr. Byrne states that he "brings this action against the Cleveland Clinic and the Chester County Hospital for damages arising out of a breach of contract and warranty." Am. Compl. at 1. Immediately thereafter, Mr. Byrne inserts the heading "Jurisdiction" and the subheading "EMTALA 42 U.S.C. 1395dd." Id. Following these headings, Mr. Byrne sets forth a series of allegations in a section titled "Statement of the Case (Factual Background)." Id. at 2. There, he alleges that he arrived at the Chester County Hospital Emergency Room at 5:00 p.m. on February 15, 2007, complaining to the Emergency Room agents and personnel of severe chest pain and shortness of breath. Id. Approximately 20 minutes after his arrival, "an agent arrived [] (believed to be a nurse)," who "started to draw blood " from Mr. Byrne and requested an EKG. Id. Approximately 30 minutes later, a chest x-ray was performed. Id. During this time, no oxygen was provided to Mr. Byrne, no "clot busting" drugs were administered, no heart monitor was in place, and no doctor was in attendance. Id.

Mr. Byrne alleges that "[h]ours later," an Emergency Room doctor came into the room, and then "[h]ours after [Mr. Byrne's] arrival," a "Dr. Lewis" arrived and provided Mr.Byrne

---

[4]  Some, but not all, of these allegations are presented in numbered paragraphs of the Amended Complaint.  For ease of reference, citations have been provided to the page(s) of the Amended Complaint on which each allegation appears, rather than to the particular paragraph(s) in the Amended Complaint, as is customary.

with a choice between a "clot busting drug or a stent." Id.[5] "Dr. Lewis recommended a stent." Id. Sometime thereafter, a "catheterization procedure" was performed on Mr. Byrne, and he came out of this procedure at approximately 11:30 p.m. Id. It is unclear what the catheterization procedure entailed, and who performed the procedure.

Following these allegations, Mr. Byrne avers that he is a resident of Pennsylvania, that Cleveland Clinic is an Ohio corporation, and that Chester County Hospital is a Pennsylvania Corporation. Id. at 2-3. He repeats some of the allegations stated above, and then states that Cleveland Clinic and Chester County Hospital "entered into an implied contract with [Mr. Byrne] and the public that 90 minutes or less is the time from entry into the emergency room to stent procedure." Id. at 3. Mr. Byrne again repeats some of his allegations, altering the language slightly to indicate that he was not seen by an Emergency Room doctor until at least two hours after he arrived at the emergency room.[6] Id. Mr. Byrne alleges that "[d]ue to the length of time in delaying treatment," Chester County Hospital breached the contractual agreement with Mr. Byrne, and as a result Mr. Byrne suffered heart damage and mental duress. Id.

Following the "Statement of the Case (Factual Background)," Mr. Byrne sets forth a series of allegations in Count I, which is titled "Breach of Contract" and subtitled "Plaintiff v. Chester County Hospital." Id. at 4. In this section of his pleading, he states that he "entered into the aforesaid agreement in good faith [which] provided that defendant, Chester County Hospital provided 90 [sic] minute or less treatment." Id. He states that "[i]n fact Defendant Chester

---

[5] Presumably, "Dr. Lewis" is the same "Emergency Room doctor" to whom Mr. Byrne refers, but this is not clear from the Amended Complaint.

[6] Mr. Byrne states that "more than two hours later, an emergency room Doctor came into the room. Hours after arriving at the emergency room a Dr. Lewis arrived" and provided Mr. Byrne with a choice between a "clot busting drug or a stent." Am. Compl. at 3.

County Hospital failed to treat [Mr. Byrne] in the 90 minute or less time as promised or to make other arrangements for [Mr. Byrne]," and therefore Chester County Hospital is liable for $50,000 "or more," jointly and severally, and the costs of his lawsuit.  Id.

Mr. Byrne then sets forth a series of allegations in Count II, which is titled "Plaintiff v. The Cleveland Clinic," and subtitled "Breach of Contract."  Id.  In this section, Mr. Byrne alleges that at all relevant times, Chester County Hospital acted as an agent and/or representative for the Cleveland Clinic, "and was therefore able to expressly or impliedly bind them in agreement."  Id.  Chester County Hospital actually "entered into the agreement as an agent of [the Cleveland Clinic] and was able to bind them in the agreement."  Id.  At all relevant times, the Cleveland Clinic "held itself out as a qualified "HOSPITAL", i.e. as [sic] business entity in the business of providing the best medical services."  Id. at 5.  Mr. Byrne states that "[n]either [Chester County Hospital] nor [the Cleveland Clinic] performed the emergency heart care as stated (90 minutes or less) and agreed to, therefore, Defendant [the Cleveland Clinic] breached its agreement with [Mr. Byrne]."  Id.  He states that the Cleveland Clinic "expressly or impliedly ratified the actions and omissions of Chester County Hospital" and that he "reasonably relied upon the assurances and promises made by [the Cleveland Clinic's] affiliation(s) with Chester County Hospital."  Id.  Mr. Byrne asserts that the Cleveland Clinic is liable for $50,000, jointly and severally, and the costs of his lawsuit.  Id.[7]

_____

[7] Mr. Byrne attaches a prior order of the Court as well as three witness affidavits to his "Reply Response." In resolving the motions to dismiss, the Court may consider the allegations contained in the complaint, exhibits attached to the complaint, matters of public record and records of which the Court may take judicial notice.  See Tellabs, Inc. v. Makor Issues & Rts., 127 S. Ct. 2499, 2509 (2007); Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993).  The affidavits provided by Mr. Byrne do not fall into any of (cont. . . )

II.     STANDARD OF REVIEW

At the outset, the Court notes that Mr. Byrne's pro se pleading must be "liberally

construed."  Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Bieros v. Nicola, 839 F.Supp.

332, 334 (E.D. Pa. 1993).  Due to an "understandable difference in legal sophistication," pro se

litigants such as Mr. Byrne are held to a "less exacting standard" than trained counsel.  Lopez v.

Brown, No. 04-6267, 2005 U.S. Dist. LEXIS 26715 (D.N.J. Nov. 4, 2005) (citing Haines v.

Kerner, 404 U.S. 519, 520 (1972)).  The Court construes pro se pleadings liberally and is

prepared to "apply the applicable law, irrespective of whether the pro se litigant has mentioned it

by name."  Dluhos v. Strasberg, 321 F.3d 365, 369 (3d Cir. 2003) (internal citation omitted).[8]

While the Court of Appeals for the Third Circuit traditionally has given pro se litigants "greater

leeway where they have not followed the technical rules of pleading and procedure," Tabron v.

Grace, 6 F.3d 147, 153, n.2 (3d Cir. 1993), all parties must nonetheless follow the Federal Rules

of Civil Procedure, Thomas v. Norris, No. 02-1854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D.

Pa. Sept. 8, 2006).

---

(cont . . .)
these categories.  Where information beyond the pleadings is cited, the Court has the discretion
to decide whether to *exclude* such information and examine whether the plaintiff states
legitimate claims based solely on the complaint, or to *convert* the motion to dismiss to a motion
for summary judgment and examine appropriate extrinsic materials submitted by the parties.
Tripodi v. Coastal Automation LLC, No. 06-4071, 2007 U.S. Dist. LEXIS 71852, **6-8 (E.D.
Pa. Sept. 26, 2007).  If the Court chooses to convert the motion into one for summary judgment,
the Court must follow Rule 56(f) and give a nonmoving party the opportunity to obtain any
discovery necessary to oppose the motion.  Id.  Here, the Court declines to consider the
documents attached to Mr. Byrne's Reply Response.  The parties must engage in discovery to
determine whether Mr. Byrne's alleged facts, to the extent they are pertinent to the remaining
cause(s) of action, are supported by evidence.

[8]  This admonition governs cases favorable to the pro se plaintiff, as well as those less so.

A.    Federal Rule of Civil Procedure 12(b)(1)

A district court can grant a motion to dismiss pursuant to Rule 12(b)(1) based on the legal insufficiency of the claim. Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1408 (3d Cir. 1991). In moving to dismiss a claim pursuant to Rule 12(b)(1), a party may challenge a court's jurisdiction either facially, i.e., based on the legal sufficiency of the claim, or factually, i.e., based on the sufficiency of jurisdictional fact. Medtronic Vascular, Inc. v. Boston Scientific Corp., 348 F. Supp. 2d 316, 321 (D. Del. 2004).

Dismissal under a facial challenge is proper "only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.'" Kehr Packages, Inc., 926 F.2d at 1408-09 (quoting Bell v. Hood, 327 U.S. 678, 682, (1946)). In this circumstance, the court must accept all well-pleaded allegations in plaintiff's complaint as true, and must view them in the light most favorable to the non-movant. In re Kaiser Group Int'l Inc., 399 F.3d 558, 561 (3d Cir. 2004). However, a party asserting that the court has jurisdiction *always* bears the burden of showing that the case is properly before the court. Packard v. Provident Nat'l Bank, 994 F.2d 1039, 1045 (3d Cir. 1993) (citing McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189 (1936)).

Where subject matter jurisdiction "in fact" is challenged, the trial court's very power to hear the case is at issue, and the court is therefore "free to weigh the evidence and satisfy itself as to the power to hear the case." Mortensen v. First Federal Savings and Loan Assoc., 549 F.2d 884, 891 (3d Cir. 1977). In such an attack pursuant to Rule 12(b)(1), "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc., 227 F.3d 62, 69 (3d Cir. 2000) (internal

quotations omitted).  Where a defendant attacks a court's factual basis for exercising subject matter jurisdiction, the plaintiff must meet the burden of proving that jurisdiction is appropriate. Id.

B.      Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion to dismiss tests the sufficiency of a complaint.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Although Rule 8 of the Federal Rules of Civil Procedure requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007) (quoting Conley, 355 U.S. at 47), the plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. (citations omitted).  Specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ."  Id. at 1965 (internal citations omitted).  To survive a motion to dismiss, a civil complaint must allege "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (confirming that Twombly applies to all civil cases).

The Court "must consider only those facts alleged in the complaint and accept all of the allegations as true."  ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994) (citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984)); see also Twombly, 127 S. Ct. at 1965 (stating that courts must assume that "all the allegations in the complaint are true (even if doubtful in fact)").  The Court must also accept as true all reasonable inferences that may be drawn from the allegations, and view those facts and inferences in the light most favorable to the non-moving party.  Rocks v. Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989).  The Court, however, "need not

accept as true 'unsupported conclusions and unwarranted inferences,'" Doug Grant, Inc. v.

Greate Bay Casino Corp., 232 F.3d 173, 183-84 (3d Cir. 2000) (internal citations omitted), or the

plaintiff's "bald assertions" or "legal conclusions," Morse v. Lower Merion Sch. Dist., 132 F.3d.

902, 906 (3d Cir. 1997).

The Court may consider the allegations contained in the complaint, exhibits attached to

it, matters of public record and records of which the Court may take judicial notice. See Tellabs,

Inc., 127 S. Ct. at 2509; Ieradi v. Mylan Labs., Inc., 230 F.3d 594, 600 n. 3 (3d Cir. 2000)

("Under Federal Rule of Evidence 201, we may take judicial notice at any stage of the

proceeding of a fact not subject to reasonable dispute that is capable of accurate and ready

determination by resort to a source whose accuracy cannot be reasonably questioned."); Pension

Benefit Guar. Corp., 998 F.2d at 1196. See also footnote 7, supra.

III.    DISCUSSION

A.      Jurisdiction and Federal Rule of Civil Procedure 12(b)(1)

Defendants' Rule 12(b)(1) challenge appears to be a facial challenge, which contests the

sufficiency of the pleadings. Accordingly, the Court must accept the allegations of the Amended

Complaint as true, and consider whether Mr. Byrne's claims "clearly appear[] to be immaterial

and made solely for the purpose of obtaining jurisdiction or where [the claim] is wholly

insubstantial and frivolous." Bell, 327 U.S. at 682-83.

There are two types of subject matter jurisdiction: diversity jurisdiction and federal

question jurisdiction. According to the allegations of the Amended Complaint, it is apparent that

there is no diversity jurisdiction in this case, given that both Mr. Byrne and Chester County

Hospital are Pennsylvania citizens. Indeed, none of the parties contend otherwise. However,

Mr. Byrne asserts that there is federal question jurisdiction because he brings claims under a

federal law, specifically EMTALA.

B.    EMTALA

Congress enacted EMTALA based on concerns that, for economic reasons, hospitals either were refusing to treat certain emergency room patients, or were improperly transferring such patients to other institutions (that is, "patient dumping"). Torretti v. Main Line Hospitals, Inc., 580 F.3d 168, 173 (3d Cir. 2009) (internal citations omitted); see Power v. Arlington Hosp. Ass'n, 42 F.3d 851, 856 (4th Cir. 1994). EMTALA "requires hospitals to give certain types of medical care to individuals seeking presented for emergency treatment: (a) appropriate medical screening, (b) stabilization of known emergency medical conditions and labor, and (c) restrictions on transfer of unstabilized individuals to outside hospital facilities." Torretti, 580 F.3d at 172-73 (citing Urban v. King, 43 F.3d 523, 525 (10th Cir. 1994), for the proposition that "a hospital has two primary obligations under EMTALA: (1) if an individual arrives at an emergency room, the hospital must provide appropriate medical screening to determine whether an emergency medical condition exists; and (2) if the hospital determines an individual has an emergency medical condition that has not been stabilized, it may not transfer the patient unless certain conditions are met."). The statute states, in pertinent part:

(a) Medical screening requirement

In the case of a hospital that has a hospital emergency department, if any individual . . . comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists . . .

(b) Necessary stabilizing treatment for emergency medical conditions and active labor

(1) In general[:]  If any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide

either—

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

42 U.S.C. §§ 1395dd(a), (b).[9]

EMTALA was "not intended to create a federal malpractice statute or cover cases of hospital negligence." Toretti 580 F.3d at 178; see also id. at 173-74. The statute simply "requires hospitals to provide medical screening and stabilizing treatment to individuals seeking emergency care in a nondiscriminatory manner. Although Congress was concerned that the indigent and uninsured tended to be the primary victims of patient dumping, EMTALA is not limited to these individuals." Id. at 173 (citing Roberts v. Galen of Va., Inc., 525 U.S. 249, 252 (1999) (per curiam) (stating that EMTALA does not require plaintiff to show "that the hospital's inappropriate stabilization resulted from an improper motive such as one involving the indigency, race, or sex of the patient")) (other internal citations omitted). "[A]ny individual who suffers personal harm as a direct result of a hospital's violation of the statute may bring a private civil action for damages." Toretti at 173.

C.     EMTALA Screening Claim

EMTALA does not define "appropriate medical screening examination" except to say that the purpose of such a screening is to identify an "emergency medical condition." See Power, 42 F.3d at 856; Collins v. DePaul Hosp., 963 F.2d 303, 306-07 (10th Cir. 1992); Cleland

---

[9]   Subsection (e)(4) of § 1395dd defines "transfer" as including the discharge of a patient from the hospital at the direction of any person employed by the hospital. Accordingly, EMTALA prohibits hospitals from both transferring and discharging those patients who have been determined to have an "emergency medical condition" and have not been stabilized.

v. Bronson Health Care Group, 917 F.2d 266, 271 (6th Cir. 1990) (in the context of an

EMTALA claim, referring to "appropriate" as "one of the most wonderful weasel words[10] in the

dictionary").  "Circuit Courts of Appeal have interpreted the statute as requiring hospitals to

provide uniform screening 'to all those who present substantially similar complaints.'"

Kauffman v. Franz, No. 07-5043, 2009 U.S. Dist. LEXIS 88749 (E.D. Pa. Sept. 24, 2009)

(quoting Cruz-Queipo v. Hosp. Espanol Auxilio Mutuo de Puerto Rico, 417 F.3d 67, 70 (1st Cir.

2005)).  "[T]he plain language of [EMTALA] requires a hospital to develop a screening

procedure designed to identify such critical conditions that exist in symptomatic patients and to

apply that screening procedure uniformly to all patients with similar complaints.  The key

requirement is that a hospital apply its standard of screening *uniformly* to all emergency room

patients, regardless of whether they are insured or can pay."  Power, 42 F.3d at 856 (internal

quotations omitted, and emphasis in original).  See Summers v. Baptist Med. Ctr. Arkadelphia,

91 F.3d 1132, 1138 (8th Cir. 1996) (en banc); Brooks v. Maryland Gen. Hosp., 996 F.2d 708,

710-711 (4th Cir. 1993).  "[A] refusal to follow regular screening procedures in a particular

instance contravenes [EMTALA], but faulty screenings in a particular case, as opposed to

disparate screening or refusing to screen at all, does not contravene the statute."  Correa v.

Hospital San Francisco, 69 F.3d 1184, 1192-93 (1st Cir. 1995).

However, a showing of uniformity may not be sufficient to fulfill a hospital's duties

under the screening provisions of EMTALA, if the screening that the plaintiff received is so

delayed or paltry as to amount to no screening at all.  Id.  "[A]n egregious and unjustified delay

in attending a patient can amount to an effective denial of a screening examination . . .

---

[10]  The Court will resist the tacit invitation to list other "wonderful" equivocal or ambiguous
words that appear in legislation or case law.  Suffice it to say there are a number of candidates.

Depending on the particular circumstances of a case . . . the Court can find that no screening at all was provided to the patient." <u>Marrero v. Hospital Hermanos Melendez</u>, 253 F. Supp. 2d 179, 194 (D.P.R. 2003) (internal citations omitted).[11]

For instance, in <u>Correa v. Hospital San Francisco</u>, the First Circuit Court of Appeals affirmed a jury verdict for plaintiffs on their EMTALA screening and stabilization claims, in a case where the patient presented to a hospital emergency room with chest pains and was not examined for approximately two hours, then was driven to a doctor's office and passed away. The court stated:

> [R]egardless of motive, a complete failure to attend a patient who presents a condition that practically everyone knows may indicate an immediate and acute threat to life can constitute a denial of an appropriate medical screening examination under section 1395dd(a) [of EMTALA]. Much depends upon circumstances; we recognize that an emergency room cannot serve everyone simultaneously. But we agree with the court below that the jury could rationally conclude, absent any explanation or mitigating circumstances, that the Hospital's inaction here amounted to a deliberate denial of screening.

<u>Correa</u> 69 F.3d at 1193. Similar reasoning has been applied by other courts in cases where plaintiffs alleged that lengthy emergency room delays gave rise to an EMTALA screening claim.

---

[11] In <u>Marrero</u>, a patient was transferred to a hospital with a history of diabetes, arterial hypertension, bronchial asthma and psychiatric conditions, dizziness, vomiting, and headache. <u>Marrero v. Hospital Hermanos Melendez</u>, 253 F. Supp. 2d 179, 183-84 (D.P.R. 2003). There was evidence that the hospital delayed approximately half an hour in taking the patient's vital signs, another hour and a half before having an emergency room physician examine the patient, and another several hours before running any tests. <u>Id.</u> at 184-85. The hospital subsequently discharged the patient, despite his unbearable headache and heart pressure of 150/90, and against his wishes and the wishes of his wife. <u>Id.</u> at 185. The patient died a few days later of a cerebral edema, due to conditions associated with his diabetes condition. <u>Id.</u> The court denied summary judgment for defendant on plaintiff's EMTALA screening claim, holding that there were questions of fact as to whether the patient's medical condition was screened *at all*, or whether the examination provided was "so cursory that it [was] 'not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury.'" <u>Id.</u> at 192 (quoting <u>Eberhart v. City of Los Angeles</u>, 62 F.3d 1253, 1257 (9th Cir. 1995)).

See Brooks, 996 F.2d 708, 709, 713-14 (4th Cir. 1993) (patient complaining of acute weakness and a sudden inability to walk who presented to the emergency room and experienced excessive delays in treatment and evaluation, could assert a screening claim under EMTALA); Scruggs v. Danville Regional Medical Center of Virginia, L.L.C., No. 08-00005, 2008 U.S. Dist. LEXIS 68630, **10-12 (W.D. Va. Sept. 5, 2008) (denying motion to dismiss plaintiff's EMTALA screening claim, where plaintiff asserted that over eleven and a half hours had elapsed between the time he presented himself to the emergency room and the time that he was examined by a doctor). [12]

---

[12] This is not to suggest that an EMTALA screening claim can arise from *every* delay that occurs after a patient arrives in a hospital emergency room. For example, in Collins v. DePaul Hosp., 963 F.2d 303 (10th Cir. 1992), a case cited by Defendants, the plaintiff came in to an emergency room and received an extensive emergency medical examination and treatment for serious injuries that he sustained during an accident. Id. at 304. Nevertheless, the plaintiff brought a medical screening claim under EMTALA, alleging that although the hospital may have appropriately diagnosed and treated the vast majority of his injuries, the hospital failed to appropriately screen him because it did not take an x-ray of his hip for approximately 25 days. Id. at 304-05. When the x-ray eventually was taken, it reflected that plaintiff had a fractured hip, but because of the delay between the injury and its detection, plaintiff suffered permanent loss of length in his leg and also lost the opportunity to have his hip reconstructed. Id. The appellate court affirmed the district court's grant of summary judgment to the hospital, noting that the hospital had given the patient a medical screening upon his arrival to determine whether an "emergency medical condition exists," and in fact determined that such a condition did exist, which is why the hospital placed plaintiff in the ICU and treated him for the next 25 days. Id. at 305-08. The court held that EMTALA screening provision is "not intended to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances." Id. at 307.

Mr. Byrne's case is distinguishable from Collins, in that Collins was a summary judgment decision, rather than a motion to dismiss. Here, Mr. Byrne alleges that he presented to the emergency room with chest pain – which obviously may constitute an "immediate and acute threat to life," Correa, 69 F.3d at 1193 – and alleges that he received no meaningful screening to see whether he had an emergency condition until many hours had passed. At this juncture in the life of this case, it is not clear whether Mr. Byrne's EMTALA screening claim will survive the summary judgment stage (should a defendant choose to pursue such a motion after discovery), but the allegations in Mr. Byrne's Amended Complaint are at least minimally sufficient to survive a motion to dismiss.

Defendants point out that, according to the Amended Complaint, various tests and a catheterization procedure were eventually performed on Mr. Byrne, and they argue that this satisfies the hospital's obligation under EMTALA's screening position.  However, "the provision of some testing or treatment to a patient [does not] a priori satisf[y] a hospital's statutory obligation to appropriately screen."  Marrero, 253 F. Supp. 2d at 195; see Romo v. Union Memorial Hosp., Inc. 878 F. Supp. 837, 842 (W.D. N.C. 1995).  Based on the caselaw, as well as common sense, chest pains certainly may constitute an "immediate and acute threat to life," Correa, 69 F.3d at 1193, and yet Mr. Byrne alleges that he was effectively ignored for multiple hours after presenting to the emergency room.  To state a cause of action under EMTALA's screening provision, a claimant "need only allege that  . . . a hospital's emergency room failed to screen the plaintiff or did not apply the same standard of screening to the plaintiff that it applies to other patients."  Brooks, 996 F.2d 708, 713 (4th Cir. 1993).  This Mr. Byrne has done.  His allegations, albeit liberally construed, reflect that Chester County Hospital failed to provide him with an "appropriate"[13] screening examination, as shown by the alleged lengthy

---

[13]  With respect to medical screening claims, some courts have noted that "appropriate" may be determined in reference to the motives with which the hospital acts.  See Cleland, 917 F.2d at 269-72.  Meanwhile, other courts have noted that any departure from standard screening procedures or differential treatment of a patient is sufficient to incur liability, without regard to a hospital's motives.  See Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041, n.3 (D.C. Cir. 1991); Power, 42 F.3d at 857.  The Third Circuit Court of Appeals has not explicitly adopted either of these positions, but its recent citation of Roberts v. Galen of Va., Inc., 525 U.S. 249, 252 (1999) (per curiam), suggests that the latter position may be favored.  See Toretti, 580 F.3d at 173 (citing Roberts v. Galen of Va., Inc., 525 U.S. 249, 252 (1999) (per curiam), and noting the statement in Roberts that EMTALA does not require plaintiff to show "that the hospital's inappropriate stabilization resulted from an improper motive such as one involving the indigency, race, or sex of the patient").  In any case, the majority view - and, as far as this Court is concerned, the better view -  appears to be that a plaintiff need not allege that the hospital acted with improper motives, in order to survive a motion to dismiss an EMTALA screening claim.

delay between the time Mr. Byrne arrived in the Emergency Room with chest pains, and the time he allegedly was eventually examined by a doctor and treated for those chest pains. Further, Mr. Byrne's pleadings confirm that his EMTALA claims are not based on the *nature* of the actual screening or treatment he eventually received, but rather on the *excessive time* it took for him to receive a screening or treatment.[14] Accordingly, the allegations contained in Mr. Byrne's <u>pro se</u> Amended Complaint are sufficient to meet the pleading standard for an EMTALA screening claim.

      D.    EMTALA Stabilization Claim

      The Third Circuit Court of Appeals recently described an EMTALA "stabilization" claim under 42 U.S.C. § 1395dd(b)(1) as one where the plaintiff "(1) had 'an emergency medical condition; (2) the hospital actually knew of that condition; [and] (3) the patient was not stabilized before being transferred.'" <u>Toretti</u>, 580 F.3d at 178 (quoting <u>Baber v. Hospital Corp. of America</u>, 977 F.2d 872, 883 (4th Cir. 1992)). The term "to stabilize" is specifically defined by

---

[14]  Mr. Byrne clarifies that he is "not contesting the actual treatment received, which would be the case with malpractice, if treatment damaged the patient, but he is contesting the time it took to receive treatment which is covered by EMTALA and Chester County and Cleveland Clinic[']s implied contract." Pl.'s "Further Reply Response" at 2. Mr. Byrne then cites <u>Hillcrest Baptist Medical Center v. Wade</u>, 172 S.W.3d 55 (Tx. App. 2005), for the proposition that "EMTALA case law dictates that each and every emergency room patient with chest pains is entitled to a full course of hospital services," a course which "starts with immediate emergency nursing triage, history and vital signs, and goes through the steps of prompt EKG administration and interpretation by [a] trained nurse or emergency physician and then if necessary prompt attention from a cardiac specialist, prompt use of thrombolytic clot-busting medications, and, if necessary, same-day cardiac catheterizations." Pl.'s "Further Reply Response" at 2.

     In <u>Hillcrest,</u> the Texas Court of Appeals affirmed the district court's denial of a medical center's motion to dismiss in a case involving heart damage resulting from a delayed angioplasty. <u>Hillcrest</u>, 172 S.W.3d at 57, 60-61. The plaintiff's claims in <u>Hillcrest</u> were for medical malpractice, and not violations of EMTALA. <u>Id.</u> While <u>Hillcrest</u> may suggest that Mr. Byrne may have a medical malpractice claim, it does not assist Mr. Byrne in making any EMTALA claim.

EMTALA, and "means, with respect to an emergency medical condition . . . [a hospital must] provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). Under EMTALA, hospitals can only be held accountable for failing to stabilize conditions of which they were actually aware, not those of which they should have been aware. Torretti, 580 F.3d at 178. The stabilization and transfer provisions of EMTALA are "triggered only after a hospital 'determines that [an] individual has an emergency medical condition.'" Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1040 (D.C. Cir. 1991) (citing 42 U.S.C. § 1395dd(b)(1), (c)).

Although not explicitly stated in the text of EMTALA, the caselaw makes it clear that EMTALA mandates stabilization only in the event of a transfer or discharge, and does not obligate hospitals to provide stabilization treatment for patients who are not transferred or discharged. See Fraticelli v. Hospital Hermanos, 300 Fed. Appx. 1, 4 (1st Cir. Nov. 13, 2008); Bryant v. Adventist Health System/West., 289 F.3d 1162, 1168-69 (9th Cir. 2002); Harry v. Marchant, 291 F.3d 767, 768, 771 (11th Cir. 2002); Bryan v. Rectors and Visitors of Univ. of Virginia, 95 F.3d 349, 352 (4th Cir. 1996); Smith v. Albert Einstein Medical Center, No. 08-5689, 2009 U.S. Dist. LEXIS 71403 (E.D. Pa. Aug. 12, 2009); Marrero, 253 F. Supp. 2d at 198; Mazurkiewicz v. Doylestown Hospital, 223 F. Supp. 2d 661, 665 (E.D. Pa. 2002). "By mandating treatment only in the context of a patient transfer, the stabilization requirement addresses Congress' concern regarding rejection of patients without converting EMTALA into a federal malpractice statute." Harry, 291 F.3d at 774 (affirming the district court's dismissal of a stabilization claim brought on behalf of a patient who died after waiting for several hours to

receive treatment in an emergency room, but who was never transferred or discharged from the hospital).  Accordingly, although a hospital's egregious delay in providing screening may provide the basis for an EMTALA *screening* claim, it does not provide a basis for an EMTALA *stabilization* claim, where the patient was eventually treated and stabilized before being discharged or transferred.  See Torres Otero v. Hospital Gen. Menonita, Inc., 115 F. Supp. 2d 253, 260 (D.P.R. 2000) (holding that an allegation that the stabilization treatment provided was incorrect or delayed did not reflect that the defendant hospital violated its statutory duty to stabilize before transfer or discharge).

Mr. Byrne's pro se Amended Complaint does not define his EMTALA claim as one for stabilization, but his "Further Reply Response" makes clear that he intends to assert a stabilization claim under EMTALA.  In essence, Mr. Byrne argues that he came to the emergency room with an "emergency medical condition" and the hospital failed to properly stabilize his condition until a substantial amount of time had passed.  Mr. Byrne states that "if stabilization had occurred [Mr. Byrne] could have been transferred to another hospital, instead the hospital delayed treatment and did not transfer."  Pl.'s "Further Reply Response" at 3.  He then states that the "simple fact [is] that emergency treatment was significantly delayed, [Mr. Byrne] was not stabilized, and thus the actions of Chester County's Hospital staff significantly affected [Mr. Byrne's] physical health."  Id.

Mr. Byrne's allegations and factual assertions do not reflect that he was transferred or discharged from the hospital prior to receiving a "catheterization procedure" and being stabilized.  See generally Am. Compl.[15]  Therefore, under the caselaw discussed above, Mr.

---

[15]  Mr. Byrne's claim is not that he *was* transferred *without* being stabilized, but instead that he *was not* transferred because he was *not* stabilized – until, of course, he was given a "catheterization procedure," a treatment he does not contest and appears to recognize  (cont . . .)

Byrne cannot bring a stabilization claim under EMTALA. Moreover, any further amendment to his stabilization claim would be futile. See Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004) ("[I]f a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."). To the extent Mr. Byrne endeavors to bring an EMTALA stabilization claim in his Amended Complaint, such a claim must be dismissed with prejudice.

      E.      Proper Defendants Under EMTALA

Under EMTALA, injured plaintiffs may sue a "participating hospital" as that term is defined in the statute. See 42 U.S.C. § 1395dd(d)(2)(A) (stating that an individual may bring "a civil action against [a] participating hospital"). A "participating hospital" is defined as one that has entered into a "provider agreement" under 42 U.S.C. § 1395cc, which permits hospitals to seek Medicare or Medicaid reimbursement. See id. §§ 1395dd(e)(2), 1395cc. "Hospitals that voluntarily participate in the Medicare or Medicaid programs and have effective provider agreements must comply with EMTALA." Toretti, 580 F.3d at 173, n.8 (internal quotations and citations omitted). Other than "participating hospitals," EMTALA does not provide for causes of action against individual physicians, physician groups, or any other medical entity. See Brooks v. Md. Gen. Hosp., Inc., 996 F.2d 708, 710 n.2 (4th Cir. 1993); Power, 42 F.3d at 854, n.1 (4th Cir. 1994); Baber, 977 F.2d at 877; Marrero, 253 F. Supp. 2d at 183, n.2.

Mr. Byrne does not specifically allege that Chester County Hospital qualifies as a participating hospital governed by EMTALA. Despite the absence of this important allegation, the Court will construe the pro se amended complaint liberally, and presume that EMTALA

_____

(cont . . .)
as appropriate and effective. See generally Am. Compl.; Pl.'s "Further Reply Response."

governs this hospital, inasmuch as - from all appearances in this case thus far - EMTALA likely

applies to it.  See Smith v. Albert Einstein Medical Center, No. 08-5689, 2009 U.S. Dist. LEXIS

71403, *14 (E.D. Pa. Aug. 12, 2009).[16]

F.      Statute of Limitations and the "Third Circuit Rule"

Defendants argue that Mr. Byrne's EMTALA claims are time-barred because he did not

bring them within two years of the alleged EMTALA violation.  See § 1395dd(d)(2)(C).  Federal

Rule of Civil Procedure 12(b) does not specifically provide for the assertion of a statute of

limitations defense in a motion to dismiss.  However, the so-called "Third Circuit Rule" allows

such a defense to be raised in a 12(b)(6) motion "if the time alleged in the statement of a claim

shows that the cause of action has not been brought within the statute of limitations."  Zankel v.

Temple Univ., 245 Fed. Appx. 196, 198 (3d Cir. 2007) (internal quotations omitted).

In cases like this one, where a plaintiff is pursuing his claims pro se and requests to

proceed in forma pauperis, the "complaint is not formally filed until the filing fee is paid, [but it

is] constructively filed as of the date that the clerk received the complaint – as long as the

plaintiff ultimately pays the filing fee or the district court grants the plaintiff's request to proceed

in forma pauperis."  McDowell v. Del. State Police, 88 F.3d 188, 191 (3d Cir. 1996).  See

Salahuddin v. Milligan, 592 F. Supp. 660, 661 (S.D.N.Y. 1984), aff'd without op., 767 F.2d 908

(2d Cir. 1985) (stating that where a plaintiff "is pro se and sends his complaint to the court, and

the complaint is not filed until a later date due to consideration of plaintiff's application to

proceed in forma pauperis, the action is deemed commenced for purposes of the statute of

---

[16]  Mr. Byrne does allege that at all relevant times, the Cleveland Clinic "held itself out as a qualified "HOSPITAL", i.e. as [sic] business entity in the business of providing the best medical services."  Am. Compl. at 5.  Read in the context of the Amended Complaint, and in light of the Court's presumption that EMTALA governs the Chester County Hospital, this is sufficient to allege that the Cleveland Clinic is a qualified hospital under EMTALA.

limitations upon receipt by the court of plaintiff's complaint, and not when it is filed."). Notably, an action is *not* deemed commenced on the date when the pro se plaintiff mails the complaint to the court, or has the complaint notorized. Salahuddin, 592 F. Supp. at 661 (holding that plaintiff's claim was barred because his complaint was not received by the Pro Se Office until after the statute of limitations period had passed, and rejecting plaintiff's arguments that his action actually commenced on the date he had his complaint notarized, or on the date that he mailed his complaint to the court).

The parties dispute the date that this case was "commenced" for purposes of the applicable statute of limitations. Mr. Byrne alleges that Defendants violated EMTALA on February 15, 2007. Therefore, to come within EMTALA's two-year statute of limitations, Mr. Byrne's IFP Application and complaint must have been received by the Clerk of Court by February 15, 2009. Defendants argue that, according to the docket, the complaint was not received by that date and, therefore, Mr. Byrne's claims are time-barred.

The defense argument might be persuasive, except that there is a handwritten date on the top of the IFP Application of "2/14/09," which is one day *before* the expiration of the statute of limitations. To be sure, the IFP Application and complaint are listed on the docket as having been filed on February 27, 2009, and the Court recognizes that the handwritten February 14 date may merely indicate in Mr. Byrne's hand when the complaint and IFP Application were *mailed* to the Clerk of Court, and not when they were actually *received* by the Clerk of Court. However, looking only at the handwritten notation itself, it is not clear who made the notation or what it represents. If it turns out that it was Mr. Byrne's writing or someone else's who is noting a date other than the document's receipt by the Court, then Mr. Byrne's claims may be time-barred, as Defendants argue. Salahuddin, 592 F. Supp. at 661. However, it is also possible that the

21

handwritten February 14 date indicates the day that the IFP Application and complaint were actually received in the courthouse. This possibility is recognized by Mr. Byrne's assertion in his "Reply Response" that he submitted his complaint and IFP paperwork to the court within the two-year statute of limitations. See Pl.'s "Reply Response" at 8.

At this point in the case, the origin and significance of the February 14 date is not yet clear, and the Court will not dismiss Mr. Byrne's pro se Amended Complaint under the Third Circuit Rule[17] (which dismissal, by its nature, would be *with prejudice* because it would be based on the premise that Mr. Byrne's claims are barred by the applicable statute of limitations). Looking at Mr. Byrne's IFP Application on its face, and considering it in conjunction with his complaint, it is not clear when Mr. Byrne's documents were actually received by the Clerk of Court. The Court cannot determine that Mr. Byrne's claims are untimely, based on the pleadings alone; therefore, the so-called "Third Circuit Rule" does not bar his claims at this time. The Court must leave it to the parties to clarify and document the issue.[18]

G.     Breach of Contract Claim

Defendants argue that (1) Mr. Byrne's "breach of contract claim" is really a medical malpractice or personal injury claim, and is therefore time-barred by the applicable two-year statute of limitations; (2) the contract claim is not sufficiently specific, as pled; and (3) Mr.

---

[17]  The Third Circuit Rule, as described above, only applies where, on the face of the complaint, a court can determine that the claims contained in it are untimely. See Zankel, 245 Fed. Appx. at 198.

[18]  The Court's review of the 2009 calendar reflects that February 14, 2009, was a Saturday; therefore, it is difficult to see how the handwritten "2/14/2009" date signifies the date that the Complaint was received by the Clerk. Nevertheless, the possibility remains, and the Court is not prepared to dismiss Mr. Byrne's claims with prejudice unless and until it is clear that such dismissal is warranted, particularly in light of Mr. Byrne's pro se status, and his representation that he submitted his complaint and IFP paperwork to the court within the two-year statute of limitations.

Byrne did not plead the existence of a written agreement supporting the contract. As discussed

above, the Court already has concluded that it cannot dismiss this case based on the expiration of

a two-year statute of limitations,[19] dispensing with Defendants' first argument. The Court rejects

Defendants' second argument, because Mr. Byrne has set forth specific allegations to plead a

contract claim.[20] The Court also rejects Defendants' third argument, because the pleading of a

written contract is only applicable to claims for breach of express contract, and Mr. Byrne's

claim is one for breach of implied contract.[21]

---

[19] This conclusion was reached in the context of a two-year statute of limitations for EMTALA, but it is equally applicable to a two-year statute of limitations for personal injury claims.

[20] Under Pennsylvania law, "'[a] cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." CoreStates Bank, Nat'l Assn. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999) (internal citations omitted). "While not every term of a contract must be stated in complete detail, every element must be specifically pleaded." Id. (internal citations omitted) (holding that appellant sufficiently set forth a claim for breach of contract because he specifically pleaded the essential terms of the agreement, a breach and damages).
    Here, Mr. Byrne has alleged that Cleveland Clinic and Chester County Hospital "entered into an implied contract with [Mr. Byrne] and the public that 90 minutes or less is the time from entry into the emergency room to stent procedure." Am. Compl. at 3. Second, he has alleged a breach of that contract, in the form of an excessive delay before screening. Third, he has alleged resultant damages, in the form of damage to his health. Additionally, Mr. Byrne's causes of action in the body of the Amended Complaint are each subtitled "breach of contract."

[21] In making this argument, Defendants assert that (1) absent an express promise to achieve a specific result, physicians and hospitals are "neither warrantors nor guarantors of a cure"; (2) Mr. Byrne fails to allege that there was an *express* agreement between him and the Defendants; and (3) Mr. Byrne fails to allege or produce a written document between himself and the Defendants that supports the existence of an express agreement. See Def. Chester County Hospital's Mot. to Dismiss at 11; Edwards v. Germantown Hospital, 736 A.2d 612, 615 (Pa. Super. 1999); see generally 40 P.S. §§ 1303.102, et seq. (2009); Murray v. University of Pennsylvania Hospital, 490 A.2d 839 (1985). These arguments ignore the statements in Mr. Byrne's Amended Complaint and responses to the motions to dismiss, which make clear that his claim is one for breach of *implied* contract, and not *express* contract. See Am. Compl. at 3 (alleging that Defendants Cleveland Clinic and Chester County Hospital "entered into an *implied contract* with [Mr. Byrne] and the public that 90 minutes or less is the time from entry into the emergency room to stent procedure.") (emphasis added). Accordingly, on their face, (cont . . .)

Nevertheless, the Court must dismiss Mr. Byrne's claim for breach of implied contract for reasons other than those argued by Defendants. As stated above, the Court is obliged to "apply the applicable law, irrespective of whether [the parties have] mentioned it by name." Dluhos, 321 F.3d at 369 (internal citation omitted). Based on its own review of Pennsylvania law, the Court determines that Mr. Byrne cannot proceed with a claim for breach of implied contract on the facts alleged, where his contract claim is based on an alleged *delay* in treatment, and not the treatment or specific result itself. See Kershak v. Pennsylvania Hospital, No. 94-6829, 1995 U.S. Dist. LEXIS 1452, **7-8 (E.D. Pa. Feb. 6, 1995) (applying Pennsylvania law and stating "[i]n limited circumstances . . . a plaintiff may assert a breach of contract claim against a health care provider. Such an action is permitted only when the parties have contracted for a specific result."); see also Kern v. Peck, 184 F.R.D. 56, 59 (M.D. Pa. 1998); Mason v. Western Pennsylvania Hospital, 453 A.2d 974, 975 (Pa. 1982); compare Orozco by Orozco v. Children's Hospital of Philadelphia, 638 F. Supp. 280, 284 (E.D. Pa.), aff'd. 813 F.2d 398 (3d Cir. 1986) (promise to achieve health of child not actionable claim for breach of contract/warranty) with Murray v. University of Pennsylvania Hospital, 490 A.2d 839, 842 (1985) (express contract/warranty that tubal ligation will prevent future pregnancies is enforceable). Accordingly, the Court shall dismiss Mr. Byrne's breach of implied contract claim with prejudice, as any further amendment to the claim would be futile.

IV.     CONCLUSION

For the reasons set forth above, the Court grants the motions to dismiss with prejudice, to

---

(cont . . .)
Defendants' arguments regarding the lack of an express agreement, or the lack of a written document supporting that express agreement, are inapplicable to Mr. Byrne's claim for breach of implied contract.

the extent that Mr. Byrne brings a stabilization claim under EMTALA. The Court also dismisses Mr. Byrne's state law breach of implied contract claim, with prejudice. The Court denies the motions to dismiss as to Mr. Byrne's EMTALA screening claim. An Order consistent with this Memorandum follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge