# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM F. BYRNE,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE CLEVELAND CLINIC, and** | : | **NO. 09-889** |
| **THE CHESTER COUNTY HOSPITAL,** | : | |
| **Defendants.** | : | |

## MEMORANDUM

GENE E.K. PRATTER, J.                                                                 MARCH 30, 2011

William F. Byrne, a *pro se* litigant, has sued The Cleveland Clinic (the "Clinic") and

Chester County Hospital (the "Hospital") relating to events that occurred on February 15, 2007

when he arrived in the Hopsital's emergency room needing medical care. Mr. Byrne's case has

undergone certain pleadings surgeries so that he now has one surviving claim, a medical

screening claim, based on the theory that Defendants failed to provide him with the appropriate

medical screening required by the Emergency Medical Treatment and Active Labor Act

("EMTALA"). Following discovery and related motion practice concerning the screening claim,

the Clinic now seeks summary judgment.[1] For the reasons set forth below, the Court grants the

Clinic's motion.

## STANDARD OF REVIEW

Upon motion of a party, granting summary judgment is appropriate "if the movant shows

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary

---

[1] After the Clinic initially filed its summary judgment motion and Mr. Byrne responded, the parties engaged in additional Court-ordered discovery after which the parties were given, and exercised, the opportunity to supplement their respective summary judgment filings.

basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, the nonmoving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" *or* by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing, that is, the non-moving party. *Anderson*, 477 U.S. at 255.

Additionally, in considering the present motion, the Court recognizes the challenges presented to a *pro se* litigant in such circumstances, and notes that Mr. Byrne's *pro se*

submissions are "liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Due to an

"understandable difference in legal sophistication," *pro se* litigants such as Mr. Byrne are held to

a "less exacting standard" than trained counsel. *Lopez v. Brown*, No. 04-6267, 2005 WL

2972843, at * 2 (D.N.J. Nov. 4, 2005) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)).

Accordingly, the Court gives *pro se* litigants like Mr. Byrne "greater leeway where they have not

followed the technical rules of pleading and procedure," *Tabron v. Grace*, 6 F.3d 147, 153, n.2

(3d Cir. 1993).[1]

## DISCUSSION

The allegations contained in Mr. Byrne's Amended Complaint, as well as the legal

framework applicable to this case pursuant to EMTALA were set forth at length in the Court's

Memorandum dated February 5, 2010 (Docket No. 31), and will not be recounted extensively

here other than as necessary.

EMTALA imposes screening obligations that require a hospital's emergency department

to provide "an appropriate medical screening examination within the capability of the hospital's

emergency department . . . to determine whether or not an emergency medical condition . . .

exists." 42 U.S.C. §§ 1395dd(a). A private cause of action for damages arises when a hospital

fails to meet its screening obligations. 42 U.S.C. § 1395dd(d)(2)(A) ("Any individual who

suffers personal harm as a direct result of a participating hospital's violation of a requirement of

this section may, in a civil action against the participating hospital, obtain those damages

available for personal injury under the law of the State in which the hospital is located, and such

equitable relief as is appropriate.").

---

[1] This is not to say that Mr. Byrne was anything other than an intelligent and diligent litigant. He
consistently demonstrated unrelenting single-mindedness in the pursuit of his litigation interests.

Direct liability for an EMTALA screening violation is restricted explicitly under the statute to certain institutions and specific circumstances. First, EMTALA only applies to "participating hospitals," which are institutions that voluntarily participate in the Medicare program and have an effective Medicare provider agreement with the federal government pursuant to 42 U.S.C. § 1395cc. *See* 42 U.S.C.A. § 1395dd*; see also In re Univ. Med. Ctr.*, 973 F.2d 1065, 1083 (3d Cir. 1992); *Jackson v. East Bay Hosp.*, 246 F.3d 1248, 1260 n.6 (9th Cir. 2001); *Miller v. Med. Ctr. of Sw. Louisiana*, 22 F.3d 626, 628 n.4 (5th Cir. 1994). Second, to be subject to the screening requirement, an institution must satisfy the multi-part definition of "hospital" under 42 U.S.C. § 1395x(e). *See Rodriguez v. Am. Intern. Ins. Co. of Puerto Rico*, 402 F.3d 45, 48 (1st Cir. 2005) (determining that a "regional diagnostic and treatment center" did not meet the definition of "hospital" under Section 1395x(e) and thus was not subject to EMTALA); *East Bay Hosp.*, 246 F.3d at 1260 (finding that the defendant health system had no direct liability under EMTALA, in part, because it was not a "hospital" pursuant to Section 1395x(e)). Third, screening duties imposed under 42 U.S.C. §§ 1395dd(a) are only triggered if a patient seeks treatment from the hospital's emergency department. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 884 (4th Cir.1992) ("[T]he hospital's duty to provide an appropriate medical screening arises only if the patient seeks treatment from the emergency department."); *Rodriguez*, 402 F.3d at 48 ("[T]he screening requirement under EMTALA only applies to patients seeking treatment at the emergency room, not elsewhere in a hospital." (citing *Lopez-Soto v. Hawayek*, 175 F.3d 170, 173 (1st Cir.1999); *Baber*, 977 F.2d at 884)); *Miller*, 22 F.3d at 629 (requiring that a patient physically arrive at the hospital's emergency department and request treatment in order for EMTALA screening liability to arise).

In light of these criteria, the Court finds that the Clinic cannot be held directly liable under Mr. Byrne's EMTALA screening claim. Even assuming, *arguendo*, that the Clinic is a "participating hospital"[2] and is a "hospital" as defined by Section 1395x(e),[3] the Clinic still cannot be directly liable to Mr. Byrne for an EMTALA screening claim because Mr. Byrne never physically entered the Clinic's emergency department, which is located in Cleveland, Ohio. Am. Compl. at Docket No. 4 ¶ 2; Clinic Answer at Docket No. 43 ¶ 2. Likewise, at no time did he request treatment from the Clinic. Clinic Mot. at Docket No. 51, Exhibit D, at 194 (Q: "Have you ever contacted anyone from the Cleveland Clinic"; Mr. Byrne: "No."). Indeed, the record reflects that Mr. Byrne went to Chester County Hospital in West Chester, Pennsylvania on February 15, 2007; all medical care that he received on that date occurred on the Hospital's premises. *See* Am. Compl. at Docket No. 4, at 2 ("Statement of the Case"); Pl.'s Resp. at Docket No. 57 at ¶ 7; Clinic Mot. at Docket No. 51, ¶ 7; *id.*, Exhibit D, at 149, 159, 161, 163-175, 190-

---

[2] The Clinic argues that Mr. Byrne has failed to properly show based on the record that the Clinic is a "participating hospital" for EMTALA purposes. *See* Clinic Mot. at Docket No. 51 at ¶ 11 ("Plaintiff cannot cite any documents, depositions, or affidavits that support his inferential connection that The Cleveland Clinic is a 'participating hospital' under EMTALA."). Indeed, Mr. Byrne merely states, without providing evidentiary support, "The Cleveland Clinic seemed like it was a participating hospital." *Id.* at ¶ 4. Under Fed. R. Civ. P. 56(e)(2), "[i]f a party fails to properly support an assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Because Mr. Byrne has not made the appropriate showing of this alleged fact, pursuant to Fed. R. Civ. P. 56(e)(2), the Court considers it undisputed *for purposes of the motion* that the Clinic is not a "participating hospital" under EMTALA. It follows that the Clinic cannot be directly liable to Mr. Byrne for an EMTALA screening claim.

[3] Neither party discusses whether the Clinic meets the definition of "hospital" under 42 U.S.C. § 1395x(e).

191.[4]  Furthermore, Mr. Byrne does not dispute these facts, Am. Compl. at Docket No. 4, at 2;

Pl.'s Resp. at Docket No. 57 at ¶ 7; nor does he cite any evidence that contradicts these facts.

Mr. Byrne does contest the Clinic's motion on the basis that the Clinic is vicariously

liable for an alleged screening violation committed by the Hospital.  Mr. Byrne argues that the

Clinic and the Hospital have an affiliation agreement that creates an agency relationship between

the two institutions, which imputes liability to the Clinic for the Hospital's actions relating to Mr.

Byrne's medical care.[5]  In support of his theory, Mr. Byrne has provided as exhibits printed

copies of the Hospital's website pages and apparent Hospital marketing materials that identify

and describe the "affiliation" relationship that exists between the Clinic and the Hospital.

---

[4] At his deposition, Mr. Byrne testified that he named the Clinic as a Defendant in this case "[p]robably because of the literature that was put out on the web and on the radio stations."  *See* Clinic Mot. at Docket No. 51, Exhibit D, at 192.  Mr. Byrne never identified any literature or advertisements from the Clinic.  When asked about what the literature specifically said about the Clinic, Mr. Byrne testified, "I didn't see the Cleveland Clinic on the literature that I saw.  That just was Chester County Hospital's claim of the 90 minutes being affiliated with the Cleveland Clinic's policies or protocol."  *Id.*

[5] In his own words, Mr. Byrne states, "The place of treatment is responsible but does not stand alone here the luring of heart care patients to [the Hospital], using there [sic] fame as on the edge."  Pl.'s Resp. at Docket No. 57, at ¶ 13.  He later clarifies his position in his Supplemental Response:

> The Cleveland Clinic is going around the country establishing marketing protocol for hospitals.  Establishing goals and programs, within these institutions, that may or may not be ready for.  Such as 90 minutes from door to baloon [sic]. Meaning, they will have you stented within that timeline if you are presenting yourseif [sic] to the emergency room with a heart attack. . . . If one of there [sic] contractual partners has a breakdown in procedure, like in my case, they claim no responsibility. I'll have to leave this up to the court whether they do have a burden here, to bear.

Pl.'s Suppl. Resp. at Docket No. 88, at 4.

In support of this argument, Mr. Byrne asserts an unspecified agency theory for vicarious liability, arguing that there is a genuine issue of fact that "lies within agency law parameters.  The Cleveland Clinic was acting as an agent of an agent."  Pl.'s Resp. at Docket No. 57, at ¶ 2; *see also id.* at ¶¶ 7, 8, 10, 11 (describing the Clinic as "an agent of an agent" and  "as part of [the Hospital]," and stating that the Clinic "acknowledge themselves as the guiding light for [the Hospital]" and that Mr. Byrne's treatment was "under the direction of Cleveland Clinic").

Upon close review of Mr. Byrne's exhibits, and reviewing them in a light most favorable to Mr. Byrne, the Court concludes that such documents cannot provide a sufficient evidentiary basis on which a reasonable jury could find that the "affiliation" relationship between the Hospital and the Clinic is one that could impute liability to the Clinic for the Hospital's alleged screening violation. Most of the materials Mr. Byrne provides only appear to confirm that an "affiliation" exists between the parties, an affiliation that is merely associative in nature. For example, one of the Hospital's web pages states in part:

> The Cardiovascular Center at The Chester County Hospital . . . is affiliated with Cleveland Clinic's Department of Thoracic and Cardiac Surgery. Our physicians, staff, and patients benefit from the knowledge and experience of one of the top cardiac surgical teams in the world and have access to information from Cleveland Clinic's Heart Center Research.

Pl.'s Resp. at Docket No. 57-1, at 4.[6]

Mr. Byrne's only evidence that provides descriptive information about the nature of the two institution's "affiliation" is a copy of a Hospital web page titled, "Points of Pride: Cleveland Clinic & The Chester County Hospital." *Id.* at 5. However, like the rest of Mr. Byrne's exhibits concerning the "affiliation," this document provides no evidence that supports Mr. Byrne's theory that the Clinic has liability for the Hospital's alleged screening violation. Rather, the web

---

[6] Mr. Byrne's other documents contain similar statements confirming the existence of an "affiliation" between the Hospital and the Clinic. Another web page contains the statement: "The Cardiovascular Center has a clinical affiliation with Cleveland Clinic's Department of Thoracic and Cardiac Surgery." Pl.'s Resp. at Docket No. 57-1, at 8. A document, titled "The Chester County Hospital," also states:
> . . . [I]n 2006, the [Cardiovascular] Center [at the Hospital] became a cardiac surgery affiliate of the Cleveland Clinic, a recognized world leader in the diagnosis and treatment of cardiovascular disease. Through this affiliation, it has grown from a local provider of care to a regional referral center and in 2008 performed over 200 heart surgeries and 1,500 catheter interventions.
Pl.'s Resp. at Docket No. 88, at 12.

page describes the "affiliation" as a cooperative arrangement between the Clinic and the Hospital that primarily focuses upon information-sharing for research, educational conferences, training, surgical protocols, advice, patient consultation, and generic quality improvements. *Id.* The web page also describes how the Clinic provides an "annual on-site review" of the Hospital's "entire cardiac surgery program, its personnel, policies, procedures, outcomes and facilities." *Id.* Furthermore, the web page indicates that the affiliation is limited to the Hospital's cardiac surgery program. *Id.* Nor is there any alleged or demonstrated relationship between the two institutions' respective emergency rooms. Because there is no indicia of a principal-agent relationship in Mr. Byrne's exhibits, nor an evidentiary basis to find that the Clinic could be held liable for the Hospital's rending care to Mr. Byrne, there is no sufficient evidence upon which a reasonable jury could conclude that the Clinic could be held vicariously liable for Mr. Byrne's screening claim.[7]

Not only is Mr. Byrne unable to support his vicarious liability theory based upon the evidentiary record, but the Clinic also provides evidence that shows the "affiliation" does not pertain to any medical care that Mr. Byrne received in the Hospital's emergency room. Specifically, the Clinic has produced its Affiliation Agreement between the Hospital and the Clinic, which limits the Clinic's affiliation with the Hospital to only the Hospital's Cardiac Surgery Program. The stated objective of the Agreement is for the Clinic to assist the Hospital become, and manage, a "well known and highly regarded cardiac surgery program as a regional provider and referral center." Clinic Suppl. Mot. at Docket No. 79, Exhibit F § 1.1. Under the

---

[7] Indeed, Mr. Byrne himself does not appear entirely convinced by his own argument. In one filing he states, "The Cleveland Clinic claims it holds no responsibility for the actions taken on the evening Feb. 15th 2007 *and maybe they don't . . . .*" Pl.'s Resp. at Docket No. 57, at 1 (emphasis added).

terms of the Agreement, the Clinic provides the Hospital's Cardiac Surgery Program with "clinical and administrative oversight and assistance" and certain enumerated services relating to the Program's patient selection criteria, protocols, medical professionals, and budget. *Id.* at §§ 1.2, 1.3, 1.9. The Agreement also provides that the Clinic will provide an annual assessment of the Cardiac Surgery Program and that the parties will "work cooperatively" to develop an annual marketing strategy for the Program that communicates "the benefits of th[e] affiliation effectively and in a timely manner throughout the communities and region served by the Hospital." *Id.* at §§ 1.6, 1.7. Thus, pursuant to the Agreement the Clinic has no affiliation with the Hospital's other departments, including the Hospital's emergency room where Mr. Byrne sought and received medical care on February 15, 2007.[8]

Accordingly, Mr. Byrne's unsupported statements and exhibits do not create a genuine dispute of material fact as to whether the Clinic is directly or vicariously liable for alleged EMTALA screening violations relating to Mr. Byrne's medical care on February 15, 2007 at the Hospital. Upon viewing the record in the light most favorable to Mr. Byrne, the Court finds there is no evidence from which a reasonable jury could find in favor of Mr. Byrne's screening

---

[8] Moreover, the Affiliation Agreement preserves the Clinic's and the Hospital's status as independent entities even with respect to the Hospital's Cardiac Surgery Program. The Agreement explicitly provides that the Hospital's Board of Trustees "retain[s] all power not specifically delegated to the [Cleveland Clinic] Foundation" under the Agreement's terms, including retaining "the authority to incur liabilities on behalf of the Hospital." Clinic Suppl. Mot. at Docket No. 79, Exhibit F § 6.1. The Agreement also provides that the Hospital retains liability for "all acts and omissions related to the Cardiac Surgery Program, and this Agreement, its employees, contractors, and/or patients and their invitees who participate in the Cardiac Surgery Program at the Hospital." *Id.* § 6.2. The Agreement similarly provides that the Clinic retains liability for "all acts and omissions of its employees and contractors with respect to the Cardiac Surgery Program, the provisions of Services by [Clinic] employees or contractors, and this agreement." The Agreement specifies that "no thoracic and cardiovascular surgeon will be considered to be a [Clinic] employee or contractor." *Id.*

claim against the Clinic.  The Court thereby concludes that the Clinic is entitled to summary judgment on the EMTALA screening claim.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Court grants the Clinic's motion for summary.  An appropriate Order follows.

BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge