IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM F. BYRNE, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHESTER COUNTY HOSPITAL, | : | NO. 09-889 |
| Defendant. | : | |

**M E M O R A N D U M**

GENE E.K. PRATTER, J.                                                                                      SEPTEMBER 18th 2012

William F. Byrne, a *pro se* litigant, has sued Chester County Hospital (the "Hospital") due to his treatment in the Hospital's emergency room on February 15, 2007. The Court partially granted the Hospital's Motion to Dismiss and granted Defendant Cleveland Clinic's Motion for Summary Judgment, leaving Mr. Byrne with one surviving claim, based on the theory that the Hospital failed to provide him with the appropriate medical screening required by the Emergency Medical Treatment and Active Labor Act ("EMTALA"). The Hospital now moves for summary judgment against this claim. For the reasons that follow, the Court grants the motion.

**I.     FACTUAL BACKGROUND**

Mr. Byrne alleges that he entered the emergency room of the Hospital on February 15, 2007. Upon arriving, he told emergency room personnel that he was experiencing chest pain. Mr. Byrne alleges that those personnel began treating him within 20 minutes of his arrival, but he claims that he suffered heart damage and mental duress because subsequent aspects of his treatment were delayed.

In moving for summary judgment, the Hospital offers evidence that it had two policies in February 2007 that pertained to screening emergency room patients with chest pains. The first

policy, entitled "Emergency Department – Standard of Care Manual – Triage Section," directed Hospital personnel to begin treating a patient with chest pains by undertaking an assessment. The assessment entailed giving a patient a physical examination, questioning the patient about her symptoms, screening her for domestic violence, and creating a record that detailed her risk factors. Following the assessment, personnel were to obtain a pulse oximetry reading, immediately triage patients with suspected cardiac symptoms to a treatment area, and alert other staff of the patient's need for immediate treatment.

The Hospital's second policy, entitled "Emergency Department – Intervention Guideline," directed personnel to ask patients about the nature, severity, and location of their chest pain, as well as their associated symptoms, what made their pain better or worse, and their prior medical history. Based on the answers to those questions, personnel could give patients aspirin, an EKG, an oxygen saturation check and two liters of oxygen, a cardiac work-up, and a chest x-ray.

The Hospital has provided evidence that it followed both of its policies in screening Mr. Byrne. In regards to the first policy, the evidence shows that Mr. Byrne entered the emergency room at 5:47 p.m., and that he received a physical examination from triage nurse Linda Shepard at 5:55 p.m. Nurse Shepard asked Mr. Byrne about the onset of his pain, the severity of his pain, symptoms related to his pain, whether he had attempted self-treatment, and whether he experienced domestic violence. She also created a record that detailed Mr. Byrne's risk factors, including his blood pressure, tobacco use, and personal and family medical history. Finally, Nurse Shepard obtained a pulse oximetry reading, documented that Mr. Byrne took aspirin prior to arriving at the Hospital, and classified Mr. Byrne as a Triage Level III patient.

Nurse Shepard also asked Mr. Byrne the questions required by the Hospital's second policy for chest-pain screening.[1] She then ordered an EKG, which was completed by an emergency room technician at 6:27 p.m but was non-diagnositc. Mr. Byrne also had his blood drawn for a cardiac work-up at 6:40 p.m. and underwent chest x-rays at 6:43 p.m. At 7:50 p.m., an analysis of Mr. Byrne's blood indicated that he had potentially undergone a cardiac event, and Dr. Beverly Mikuriya immediately evaluated him.[2]

Finally, the Hospital supports its motion through the sworn affidavit of Dr. Richard Donze, its Senior Vice President. The affidavit states that Mr. Byrne received the same basic screening as the other patients who came to the emergency room on February 15 and complained of chest pain. Moreover, according to the affidavit, Mr. Byrne received similar treatment in comparison to the 136 emergency room patients who complained of chest pain between January 15, 2007, and February 15, 2007.

Although he has submitted a brief and a supplemental brief in opposition to the Hospital's motion for summary judgment, Mr. Byrne has contested very few of the facts set forth above. His supplemental brief does claim that his blood tests revealed a potential heart problem at 6:40 p.m. and that his EKG showed that he was experiencing a heart attack.[3] Additionally, Mr. Byrne makes the (unsupported) assertion that the records of the 136 patients reveal that they were treated differently than he was.

---

[1] Additionally, the Hospital offers evidence that Dr. Beverly Mikuriya asked Mr. Byrne these same questions at a 7:50 p.m. evaluation.

[2] Mr. Byrne was subsequently evaluated by Dr. Joseph Lewis, a cardiologist, and received additional treatment for his heart throughout the evening.

[3] Mr. Byrne's assertion regarding the blood test is belied by the fact that the very exhibit he cites indicates that his blood was drawn at 6:40 p.m., and that the emergency room did not receive the results of the test until 7:50 p.m.

## II. STANDARD OF REVIEW

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the court of the basis for its motion for summary judgment and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by

"showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In this case, the Court recognizes the challenges presented to a *pro se* litigant and notes that Mr. Byrne's *pro se* submissions are "liberally construed." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Due to an "understandable difference in legal sophistication," *pro se* litigants such as Mr. Byrne are held to a "less exacting standard" than trained counsel. *Lopez v. Brown*, No. 04-6267, 2005 WL 2972843, at * 2 (D.N.J. Nov. 4, 2005) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Accordingly, the Court gives *pro se* litigants like Mr. Byrne "greater leeway where they have not followed the technical rules of pleading and procedure." *Tabron v. Grace*, 6 F.3d 147, 153 n.2 (3d Cir. 1993).

## III. DISCUSSION

EMTALA imposes screening obligations that require a hospital's emergency department to provide "an appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition . . . exists." 42 U.S.C. §§ 1395dd(a). A private cause of action for damages arises when a hospital fails to meet its screening obligations. 42 U.S.C. § 1395dd(d)(2)(A) ("Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.").

The Third Circuit Court of Appeals has not addressed what constitutes an "appropriate medical screening" under EMTALA. However, the Third Circuit has held that EMTALA "does not create a federal cause of action for malpractice." *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 173-74 (3d Cir. 2009) (citing *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996)). In *Summers*, the Eighth Circuit held that "[p]laintiffs are entitled under EMTALA, not to correct or non-negligent treatment in all circumstances, but to be treated as other similarly situated patients are treated . . . It is up to the hospital itself to determine what its screening procedures will be. Having done so, it must apply them alike to all patients." 91 F.3d at 1138. Several other circuit courts have reached similar holdings.[4]

Here, the Hospital has submitted evidence that it had two policies that governed screening emergency room patients who complained of chest pain. The Hospital applied both policies to Mr. Byrne by giving him a physical exam, taking his medical history, and giving him an EKG, a cardiac work-up, and chest x-rays. Furthermore, the sworn affidavit of Dr. Richard Donze attests

---

[4] *See Nolen v. Boca Raton Cmty. Hosp.*, 373 F.3d 1151, 1155 (11th Cir. 2004) ("So long as the Hospital gave to [the plaintiff] the same quality screening that it would have given a similarly situated outpatient, there is no violation of the EMTALA."); *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 797 (10th Cir. 2001) ("EMTALA's requirement of an appropriate screening examination undeniably requires [a hospital] to apply uniform screening procedures to all individuals coming to the emergency room. . . . A hospital's obligation under EMTALA is measured by whether it treats every patient perceived to have the same medical condition in the same manner.") (internal quotations omitted); *Battle v. Mem'l Hosp.*, 228 F.3d 544, 557 (5th Cir. 2000) ("A hospital's liability under EMTALA is not based on whether the physician misdiagnosed the medical condition or failed to adhere to the appropriate standard of care. Instead, the plaintiff must show that the hospital treated him differently from other patients with similar symptoms.") (citation omitted); *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994) (EMLATA's medical screening provision requires "that a hospital apply its standard of screening *uniformly* to all emergency room patients, regardless of whether they are insured or can pay. [EMLATA] does not impose any duty on a hospital requiring that the screening result in a correct diagnosis.") (emphasis in original) (internal quotation omitted); *Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991) ("[A] hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures.").

that Mr. Byrne received similar treatment in comparison to other patients who came to the Hospital's emergency room and complained of chest pain. On these facts, which the Court notes are uncontested by Mr. Byrne,[5] the Hospital applied its screening policies uniformly and should prevail on its motion for summary judgment.

Some courts have held that, in addition to the uniformity requirement described above, EMTALA allows a plaintiff to prevail on a screening claim if she receives a medical screening that is similar to those received by other patients, but nonetheless "is so cursory that it is not designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury." *Jackson v. E. Bay Hosp.*, 246 F.3d 1248, 1256 (9th Cir. 2001) (internal quotation omitted); *see also Correa v. Hosp. S.F.*, 69 F.3d 1184, 1193 (1st Cir. 1995). Mr. Byrne did not receive such a "cursory" screening. Instead, the record shows that he was given a preliminary exam, an EKG, a cardiac work-up, and chest x-rays within an hour of his arrival at the Hospital. Instead of receiving cursory treatment, Mr. Byrne was thoroughly and quickly evaluated according to the Hospital's uniformly applied procedures.[6]

## IV. CONCLUSION

For the foregoing reasons, the Court grants the Hospital's motion for summary judgment. An appropriate Order follows.

---

[5] Mr. Byrne does claim in his supplemental brief that he was treated differently than the other patients whose files he obtained through discovery. However, he offers no support for this assertion, and the Court will not rely on it as a basis for denying the Hospital's motion. *See Betts*, 621 F.3d at 252 ("Unsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment.").

[6] Mr. Byrne appears to argue that his screening was cursory because the Hospital misread the results of his EKG. However, he offers no support for his assertion that his EKG indicated that he was having a heart attack. Moreover, a "faulty screening," such as the misreading of an EKG, cannot create liability under EMLATA. *See Summers*, 91 F.3d at 1139; *Correa*, 69 F.3d at 1192-93.

BY THE COURT:


<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE